**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| SEA, LTD., | * |
| **Plaintiff** | * |
| v. | *　　　　CIVIL NO. JKB-18-1761 |
| ANTHONY CORNETTO, | * |
| **Defendant** | * |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM AND TEMPORARY RESTRAINING ORDER

This case was filed on June 14, 2018, by Plaintiff SEA, Ltd. ("S-E-A") against Anthony Cornetto. (Compl., ECF No. 1.) Filed with the complaint was S-E-A's motion for temporary restraining order ("TRO") and preliminary injunction. (ECF No. 2.) The Court set a hearing for today and directed S-E-A to provide prompt notice of the order entered yesterday scheduling the hearing. (Order, June 14, 2018, ECF No. 6.) S-E-A's counsel this morning at the hearing indicated he had emailed Cornetto at the address provided by Cornetto to S-E-A and also attempted telephone contact. The courtroom deputy also tried telephoning Cornetto this morning, but only got voice mail. Cornetto did not attend this morning's hearing. The Court is persuaded by the written materials in the record and by counsel's argument at the hearing that S-E-A has satisfied the requirements for a TRO. Accordingly, the Court will grant the motion insofar as it requests the entry of a TRO, will reserve ruling on the motion insofar as it requests a preliminary injunction, and will set a hearing to consider whether to enter preliminary injunctive relief.

## I. Factual Allegations

As alleged in S-E-A's verified complaint, S-E-A is a company that provides forensic consulting and causal/failure analysis services to clients in insurance, legal, and manufacturing industries in multiple locations, including Maryland. (Compl. ¶ 5.) Cornetto worked for S-E-A first in its office in Millersville, Maryland, and later in its office in Glen Burnie, Maryland. (*Id.* ¶ 2.) Cornetto began employment in 1999 with a corporate predecessor of S-E-A and worked for that entity until 2003. (*Id.* ¶ 18.) Prior to that employment, Cornetto had no experience working as an accident reconstruction forensic consultant or in the subspecialty of conspicuity.[1] (*Id.* ¶ 19.) Neither did he have any clients in the State of Maryland. (*Id.*) All of Cornetto's technical training "came from and at the expense of S-E-A." (*Id.*)

Around September 2003, "S-E-A, through an affiliated entity (S-E-A Acquisitions Holding, LLC), acquired Cornetto's then-employer, at which point Cornetto became both an employee as well as an owner of the Company." (*Id.* ¶ 20.) He borrowed $50,000 to purchase one membership share in S-E-A and this transaction was memorialized in a promissory note. (*Id.* ¶ 21.) Cornetto agreed, as a condition of receiving the loan and having the opportunity to become an owner, not to compete with S-E-A. (*Id.*)

Due to the specialized nature of S-E-A's services, it "invests considerable money and time in training its forensic consultants, to, among other things, ensure they can competently and credibly perform services for the Company's clients in a manner that is consistent with sound scientific or engineering principles and [are] able to withstand cross-examination." (*Id.* ¶ 6.)

---

[1] According to the complaint, conspicuity is a subspecialty of forensic analysis that focuses on "how visible (or invisible) a person, place or thing was at the time of an accident that occurred at night based on variables, such as the street light, elevation of the road, and placement of several elements at the time of the accident." (Compl., ¶ 8.) S-E-A states, "Only a handful of experts trained and experienced in the area of conspicuity exists throughout the country." (*Id.*) "One such expert is Cornetto's former S-E-A supervisor, who was grooming Cornetto to be his successor and take over this expertise, leadership and oversight of the Glen Burnie, Maryland office." (*Id.*)

Cornetto received several years of training in order to work independently on projects. (*Id.* ¶ 7.) In addition to receiving training in forensic analysis, Cornetto received training to develop his area of special expertise, conspicuity, as well as training in computer animations and imaging sciences. (*Id.* ¶ 9.)

S-E-A's forensic consultants "become inexorably and intimately knowledgeable about, among other things, S-E-A's clients, the contacts for those [clients], the specific types of cases that they handle, the financial information regarding its clients' rates, and the needs, preferences, likes, and dislikes of such clients." (*Id.* ¶ 13.) As an employee and owner of S-E-A, Cornetto was privy to that valuable information as well as to the company's business plans, strategies, and revenues. (*Id.* ¶¶ 22, 24, 26.) Over the years, "S-E-A has invested substantial time and money to acquire and build its reputation, image and relationships with its clients and business contacts, and has an established and valuable reputation, trade and patronage," which have "significant economic value to S-E-A, and would be of significant economic value to competitors in the forensic engineering business." (*Id.* ¶ 15.)

To protect its legitimate business interests in all of the foregoing, S-E-A requires its forensic consultants to sign restrictive covenants and nondisclosure agreements as a condition of employment and/or ownership in S-E-A. (*Id.* ¶ 16.) Some of these covenants and agreements "were assets of S-E-A's predecessors that were acquired by and assigned to S-E-A." (*Id.* ¶ 17.) On September 2, 2008, Cornetto executed an Employment and Confidential Information Agreement with S-E-A in which he agreed, for a period of two years following termination of his employment, not to accept directly or indirectly any new assignments or to provide any services to clients for whom Cornetto provided any client services in the twenty-four months prior to his termination date. (*Id.* ¶ 23.)

Over time, S-E-A paid Cornetto approximately $202,272 in cash distributions in return for his initial $50,000 investment and his purchase of additional shares; he also received shares as bonuses in connection with those purchases. (*Id.* ¶ 27.) Around June 2016, Cornetto informed S-E-A that he was resigning and he wanted S-E-A to purchase his membership units. (*Id.* ¶ 28.) As a condition of S-E-A's repurchase of his membership units, Cornetto and S-E-A executed a Noncompetition and Nondisclosure Agreement on June 12, 2016, in which Cornetto agreed, for the ensuing five years, not to directly or indirectly compete with S-E-A by starting his own company that is engaged in business the same as or similar to S-E-A's business, by working for anyone engaged in such business, or being an owner, officer, independent contractor, or creditor of any entity engaged in such business; the restriction was effective within the geographic territory defined as "any area which is within one hundred (100) miles of any office [of] the Company." (*Id.* ¶ 29.) Further, Cornetto agreed to cooperate with S-E-A on cases or projects in which he was involved and would receive compensation as an independent contractor for that work. (*Id.* ¶¶ 30 33.) Additionally, this agreement mandated a duty of confidentiality on Cornetto so that he would not divulge or use any of S-E-A's confidential information, including client information. (*Id.* ¶ 31.) To fulfill a duty under the September 2, 2003, Agreement, S-E-A provided Cornetto with a list of S-E-A clients whom he had agreed not to solicit. (*Id.* ¶ 34.)

Upon information and belief, S-E-A alleges Cornetto set up a competing business, Momenta, LLC, on August 13, 2016. (*Id.* ¶ 36.) On May 17, 2018, a S-E-A client, identified as such on the nonsolicitation list given by S-E-A to Cornetto at his departure from the company, forwarded an email message to Cornetto at his old S-E-A email address; the substance of the email referred to "a traffic reconstruction expert consultant project, which is precisely what Cornetto did for this same client within the last 24 months of his employment with S-E-A." (*Id.*

4

¶ 38.) S-E-A maintains and monitors Cornetto's old email address "because he still has ongoing cases that he handles pursuant to his independent contractor agreement." (*Id.* ¶ 38.) S-E-A forwarded the email directly to Cornetto and asked if it was for an S-E-A case. (*Id.* ¶ 39.) Cornetto's response indicated the client's email was sent accidentally to the S-E-A email address and that S-E-A should delete all associated emails because they might contain confidential client information. (*Id.*) The May 17 email prompted S-E-A to investigate Cornetto's activities, which S-E-A concluded were in violation of his noncompetition obligations. (*Id.* ¶ 40.)

Momenta LLC's Articles of Organization indicate it is engaged in the same or similar business of providing services as Cornetto provided when employed by S-E-A. (*Id.* ¶ 41.) Although Momenta LLC lists a business address of Cumberland, Maryland, S-E-A's investigation indicates that Cornetto is actively engaging in business with Maryland clients from his home address in Severna Park, Maryland, which is approximately eleven miles from his former S-E-A office location. (*Id.* ¶ 44.) In the hearing, S-E-A's counsel contended the Cumberland address (updated from Momenta's original address of Cornetto's Severna Park home) is a mere subterfuge. S-E-A spoke with both Cornetto and the client referenced in the May 17, 2018, email, but "[n]either would confirm that Cornetto was not violating his obligations to S-E-A. In a conversation with Cornetto on June 8, 2018, for the purpose of obtaining an explanation from him about the May 17, 2018 Email, he refused to discuss its substance, saying only that he had a different interpretation." (¶ 45.)

In investigating Cornetto's activities, S-E-A discovered another email, also dated May 17, 2018, similarly referencing Cornetto's work for another S-E-A client for whom Cornetto had provided services in the twenty-four months prior to his termination and who was also on the nonsolicitation list. (*Id.* ¶ 46.) In addition, S-E-A found a LinkedIn posting

indicating Cornetto had provided consulting services to another S-E-A client in the area of accident reconstruction and conspicuity; this client was also included in the nonsolicitation list. (*Id.* ¶ 47.)

## II. *Standard for Preliminary Injunctive Relief*

In *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), the Supreme Court set forth the following standard for preliminary injunctive relief:

> A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.

*Id.* at 20. Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22. Courts are called upon to balance a plaintiff's claims of injury against the burdens to be imposed upon the defendant, and they must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* at 24. The same standard applicable to preliminary injunctive relief is applicable to the question of whether a TRO should issue. *Long v. Bd. of Educ., Dist. 128*, 167 F. Supp. 2d 988, 990 (N.D. Ill. 2001); *Perdue Farms, Inc. v. NLRB*, 927 F. Supp. 897, 904 (E.D.N.C. 1996).

## III. *Analysis*

### A. *Likelihood of Success on the Merits*

S-E-A has demonstrated a likelihood of success on the merits of its complaint. The information before the Court shows Cornetto has violated his duties of confidentiality, nonsolicitation, and noncompetition.

### B. *Irreparable Harm in Absence of Preliminary Relief*

Cornetto's infringement upon S-E-A's valuable reputation and its client relationships irreparably harms S-E-A in the absence of injunctive relief.

### C. *Balance of Equities*

The balance of equities is in S-E-A's favor. The hardship to Cornetto caused by the imposition of injunctive relief is not grave, since the relief sought simply requires him to honor his contractual obligations to S-E-A. On the other hand, the hardship to S-E-A if injunctive relief is not granted is severe because Cornetto's breach of his agreements takes substantial, valuable business that S-E-A is lawfully entitled to claim.

### D. *Public Interest*

The need to have contractual agreements upheld is in the public interest.

## IV. Conclusion

The Court concludes S-E-A is entitled to the grant of injunctive relief in a temporary restraining order.

Accordingly, it is hereby ORDERED:

1. Plaintiff's motion (ECF No. 2) is GRANTED IN PART such that the Court herewith enters a TEMPORARY RESTRAINING ORDER: Defendant and all those acting in active participation or concert with him ARE ENJOINED from violating Defendant's contractual obligations to Plaintiff, including the restrictive covenants contained in the September 2003 Agreement and the June 16, 2016, Agreement; specifically, Defendant and all those acting in active participation or concert with him are enjoined from the following:

    a. Engaging in the business of forensic consultant services located within a 100-mile radius of any S-E-A office location other than as a consultant as provided by the terms of his Agreements;

    b. Providing forensic consulting service to any client of Plaintiff with which Defendant worked in the twenty-four months prior to the termination of his employment with Plaintiff; and

    c. Using, or causing to be used, or disclosing in any manner, any information of a confidential and/or proprietary nature relating to the business of Plaintiff including, without limitation, its client information, customer lists, employee information, employee lists, financial information, and contract and pricing information.

2. Plaintiff SHALL POST security of $5,000 with the Court by 5:00 p.m., June 19, 2018.

3. Plaintiff's motion for expedited discovery (ECF No. 3) IS GRANTED.

4. Defendant SHALL APPEAR for a hearing on Plaintiff's complaint for preliminary injunctive relief before this Court on July 12, 2018, at 9:30 a.m. in Courtroom 3D, United States Courthouse, 101 W. Lombard Street, Baltimore, Maryland 21201.

5. This TEMPORARY RESTRAINING ORDER remains in effect until 12:01 a.m. on June 30, 2018, unless vacated or modified prior to that date and time and is further subject to renewal on Plaintiff's motion.

6. Plaintiff's counsel shall ensure that Defendant receive a copy of this order.

DATED this 15 day of June, 2018, at 2:07 p.m.

BY THE COURT:

James K. Bredar
Chief Judge